2012 OK CIV APP 30

**NVI, LLC, a Louisiana Limited Liability Company, Plaintiff/Appellant,**

v.

**OKLAHOMA DEPARTMENT OF ENVIRONMENTAL QUALITY, an Agency of the State of Oklahoma, Defendant/Appellee.**

**No. 108,674.**

Court of Civil Appeals of Oklahoma,
Division No. 4.

Feb. 28, 2012.

Robert D. Kellogg, Moricoli & Schovanec, P.C., Oklahoma City, Oklahoma, for Plaintiff/Appellant.

Pamela Brown Dizikes, Office of the General Counsel, Oklahoma Department of Environmental Quality, Oklahoma City, Oklahoma, for Defendant/Appellee.

P. THOMAS THORNBRUGH, Judge.

¶ 1 NVI, LLC (NVI) appeals an administrative order of the Oklahoma Department of Environmental Quality (ODEQ), finding that NVI should be penalized $27,000 for violations of sections of the Oklahoma Environmental Quality Act and of title 252, chapter 410, of the Oklahoma Administrative Code (O.A.C.). NVI also appeals a finding that the incident giving rise to the penalties demonstrated "a lack of training or preparation" of NVI's employees.

## BACKGROUND

¶ 2 NVI conducts industrial radiography, and holds a radioactive material license from the state of Louisiana. NVI was hired to test certain pipeline welds near Ardmore, Oklahoma. NVI applied for, and received, a reciprocal license from the ODEQ.[1]

¶ 3 This case arises from a radioactive exposure incident that took place at the Ardmore site on September 2, 2008. Three of NVI's employees, Mike Stringfellow (a certified radiographer), Tommy Blair, and Rex Roberts (assistant radiographers), were conducting photographic tests of pipeline welds. The testing process involves placing a radioactive source ("a pellet") on one side of each weld, and a photographic medium on the other. The pellet is stored in an enclosure that prevents radioactivity from escaping when the pellet is not deployed. It exits and re-enters this enclosure on a control cable connected to a drive mechanism. The pellet passes thorough a "guide tube," a protective sheath for guiding the control cable. When the pellet has been retracted into the enclosure, the guide tube may be removed.

¶ 4 While Roberts was travelling between welds, the exposure device fell from his vehicle, bending the guide tube. Roberts attempted to straighten the damaged guide tube and continued with the testing process. After exposing another weld, he removed the guide tube, and found that the pellet had failed to fully retract into the enclosure. Roberts re-attached the guide tube, and managed to retract the pellet into the enclosure, but was exposed to radiation during this process.

¶ 5 Oklahoma law requires that a person in Roberts' position must carry an alarming ratemeter, a survey meter, and a dosimeter. Roberts stated that his ratemeter had not alarmed at any time, and he had not looked at his survey meter.[2] Stringfellow, as immediate supervisor, reported Roberts' exposure to NVI. Roberts' dosimeter badge was sent for testing via overnight courier. The testing, or the report of the results, was delayed by the onset of a Gulf Coast hurricane. Four days later, NVI found that Roberts had received a whole body radiation dose exceeding 16 rems,[3] three times the maximum yearly limit for employee exposure. NVI then reported this exposure to the appropriate Oklahoma and Louisiana agencies.

¶ 6 On January, 20, 2009, the ODEQ issued a compliance order, seeking an administrative penalty of $30,000. NVI requested a hearing, which was held on July 21, 2009. In a proposed order dated October 9, 2009, the administrative law judge (ALJ) affirmed the allegations and conclusions of the compliance order, but reduced the penalty by $3,000 on the basis that an "Act of God" had delayed the testing of Roberts' badge. NVI filed exceptions, and a final order was entered on December 11, 2009, incorporating the proposed order and affirming the $27,000 penalty. The proposed order contained substan-

---

1. Pursuant to O.A.C. 252:410–1–2 "reciprocity recognition" in this context means that the ODEQ has recognized a person's radiation management authorization issued by an out-of-state entity as a primary authorization and, on the strength of that underlying authorization and the person's compliance record in that and other recognizing states, has authorized that person to perform certain corresponding radiation management activities in Oklahoma without an ODEQ-issued permit, license or certification.

2. ODEQ later concluded that the battery in the ratemeter had failed. Roberts stated in a written report that he had failed to turn the meter on.

3. The rem (roentgen equivalent man) is a standard U.S. measure of "equivalent dose," and represents the quantity of ionizing radiation whose biological effect is equal to that produced by one roentgen of x-rays.

tive findings of fact and conclusions of law which are excerpted and summarized below. For convenience of reference, the numbering from the proposed order is used. The significant findings of fact were:

13. Louisiana and Oklahoma rules require certain equipment be carried by the members of the team involved, and such equipment includes a survey meter, an alarming ratemeter and a dosimeter.

14. Roberts stated that he carried a survey meter with him as he approached the ATV with the exposed source, but that he failed to notice the high radiation indicated by the meter; the survey meter used by Mr. Roberts at the time of the incident was in working order.

15. Roberts stated he was wearing a functioning ratemeter at the time of the incident, but it failed to give an audible alarm; inspectors for DEQ examined the ratemeter, concluding that it to have (sic) a dead battery.

16. Roberts stated that a function check was performed on the ratemeter the morning before the incident, and the ratemeter functioned normally.

17. Inspectors stated that a function check was documented on the source utilization log kept by Respondent [NVI].

18. Roberts stated that he was wearing his dosimeter at the time of the incident; his end of day reading was initially recorded as 5 mR, which was scratched out on the log and 200 written beneath it.[4]

19. Estimates of dosage, calculated by the dosimeter badge provider Landauer, Inc. and submitted to the DEQ, were that Mr. Roberts received a whole body radiation dose exceeding 16 rems. This compares to the NRC occupational standard that limits whole body dose to radiation workers to no more than 5 rems in a year.

20. Respondent's Operating and Emergency Procedures, revised May 25, 2007 and required as a condition of Respondent's Louisiana license, Paragraph 13.7 states:

Damaged or faulty equipment is a major contributor in causing injuries to radiography personnel. In order to reduce the possibility of radiation injuries, the following measures must be adhered to: ... (3) Inspect source tube for kinks, unusual bends, thread wear, connector damage, source tip damage, or any other defects noted. Also inspect camera end where tube connects to camera. Repair or replace as necessary.

21. In accordance with 27A O.S. § 2–3–502(B), a Notice of Violation [NOV] was issued to Respondent on October 7, 2008. The NOV alleged seven violations, including one Level II violation and five Level III violations, and required Respondent to submit a written response within 30 days. The violations alleged were as follows:

a. Failure to give at least three days written notice before commencing work in Oklahoma under reciprocity provisions, OAC 252:410–7–34(4)

b. failure to have assistant radiographers under the personal supervision of a radiographer when using radiographic exposure devices or performing surveys, OAC 252:410–10–34(4)(E), 10 C.F.R. 34.46, 10 C.F.R. 34.49(b)

c. failure of a radiographer's assistant to wear on the trunk of his body, an operating alarm ratemeter. OAC 252:410–10–34(4)(F), 10 C.F.R. 34.49(a)

d. failure to conduct a survey of a radiographic exposure device and the guide tube to determine that the sealed source has returned to a shielded position before approaching the device or the guide tube before exchanging films, re-positioning exposure head, or dismantling equipment, OAC 252:410–10–34(4)(G), 10 C.F.R. 34.49(b)

e. failure of licensee to limit annual occupational exposure for an individual employee to no more than five rems TEDE, OAC 252:410–20–1(c)(3)(A), 10 C.F.R. 20.1201(a)(1)(i)

---

**4.** A mrem or millirem is 1:1000th of a rem. Neither estimated exposure is consistent with the 16 rems of exposure reported by the dosimeter.

f. failure to report within 24 hours of discovery, of event of loss of control of licensed radioactive material possessed by licensee that may have caused an individual to receive, in a period of 24 hours a total effective dose of radiation exceeding 5 rems. OAC 252:410–20–1(c)(13)(B), 10 C.F.R. § 20.2202(b)

g. failure to abide by licensee's approved operating and emergency procedures requiring damaged source guide tubes to be repaired or replaced, Paragraph 13.7.3 of the procedures guide.

22. On November 4, 2008, DEQ received Respondent's Reply to the Notice of Violation.

23. The DEQ reviewed the Reply and found Respondent's corrective actions were adequate to resolve the outstanding noncompliance.

24. On December 10, 2008, the DEQ agreed to withdraw one violation, the single level IV violation identified as item one in the NOV; item a. above.

The order states the following conclusions of law:

1. The DEQ has regulatory jurisdiction and authority in this matter, and Respondent is subject to the jurisdiction and authority of the DEQ under the Oklahoma Environmental Quality Code (27A O.S. § 2–1–101 et seq.), including the Oklahoma Radiation Management Act, the rules promulgated thereunder at Oklahoma Administrative Code ("OAC") 252:410 and portions of 10 C.F.R. incorporated therein by reference.

2. Failure to provide adequate supervision over the activities of an assistant radiographer, as described in Findings of Fact paragraphs 8, 9 and 11, is a violation of OAC 252:410–10–34(4)(E) incorporating standards of 10 C.F.R. 34.46, that requires radiographers to supervise the performance of radiographer assistants, including direct observation by the radiographer whenever the radiographer's assistant uses radiographic exposure devices, to determine that the sealed source has returned to the shielded position after an exposure.

3. Failure to ensure that a radiographer assistant was wearing an operational alarm ratemeter as described in Findings of Fact paragraph 13.B, is a violation of OAC 252:410–10–34(4)(F) incorporating standards of 10 C.F.R. 34.47(a), wherein a licensee may not permit an individual to act as a radiographer's assistant unless, at all times during radiographic operations the individual wears, on the trunk of the body, an operating alarm ratemeter.

4. Failure of an assistant radiographer to read or heed the survey meter he carried when approaching an exposure device described in Findings of Fact paragraph 13.-A., is a violation of OAC 252:410–10–34(4)(G) incorporating standards of 10 C.F.R. 34.49(b), requiring that licensees survey the exposure device and guide tube after each exposure when approaching the device or the guide tube, to determine that the sealed source has returned to its shielded position.

5. Exposure of an assistant radiographer to a total radiation dose of more than 5 rems within a calendar year, as described in Findings of Fact paragraph 14, is a violation of OAC 252:410–20–1(c)(3)(A) that incorporates 10 C.F.R. 20.1201(a)(1)(i), requiring that licensees conduct their operations so that the occupational dose to any employee does not exceed a total effective dose equivalent of 5 rems in a year.

6. Failure to notify DEQ within 24 hours following the time the radiographer was notified of the exposure event involving his assistant radiographer, as described in Findings of Fact paragraphs 5, 12 and 14, is a violation of OAC 252:410–20–1(c)(13)(B) incorporating the standards of 10 C.F.R 20.2202(b) that requires licensees to notify the DEQ within 24 hours of discovery of an event involving loss of control of licensed material that may have caused or threatened to cause an individual to receive a total effective dose equivalent exceeding 5 rems.

7. Use of a damaged source guide tube by the assistant radiographer, as described in Findings of Fact paragraph 15, is a violation of paragraph 13.7.3 of Respondent's operating and emergency procedures (which procedures are tied to Respondent's Louisiana license) requiring

that damaged source guide tubes be repaired or replaced.

8.  The Licensee, NVI, is responsible for the activities of its employees, including any and all violations of rules promulgated as to said licensee, whether by the state of Louisiana, the state of Oklahoma, (under reciprocity), or the United States of America; the employees of Respondent are not in this case independent contractors, rather employees of Respondent under its control.

9.  The damaged guide tube was still damaged under the terms of Respondents Operating and Emergency Procedures, after Respondent's employee, Roberts, endeavored to "fix" it with a screwdriver, as he stated that there was still resistance to proper operation after that "fix", and under the terms of that controlling document should have been replaced, as Roberts was not licensed to repair such equipment.

10.  Failure to report the exposure of the employee within 24 hours was probably affected in part by an Act of God, a hurricane which was enveloping Respondent's home offices at the time.

11.  Respondent's affirmative defense to the failure of its employee to wear a functioning alarm ratemeter was not made in as much as whatever test was made of the meter before the operations in question clearly failed to warn of imminent battery failure, or employee disregard or ineptitude allowed for the ignoring of such proper warning.

12.  The failure of the certified radiographer in charge to further investigate the repair or replacement of a faulty part associated closely to the source of radiation and responsible for release of radiation, though he knew of damage to it, represents a lack of training or preparation as to the severity of such an event, a responsibility of Respondent.

13.  The cumulative unsafe actions taken in derogation of the rules resulted in the contamination of Mr. Roberts to the aforementioned excessive limits of radiation.

14.  Respondent failed to show that it was not the licensee under the reciprocity provisions with the state of Louisiana; the actions of its employees are its actions in Oklahoma.

15.  Respondent has shown a willingness to cooperate with the Department, and a proper setting out, in its Operating and Emergency Procedures, of the required and desired actions to be taken; the failures were clearly supervisory in nature.

16.  The Oklahoma Environmental Quality Code at 27A O.S. § 2–3–502(K) authorizes the DEQ to seek penalties of up to Ten Thousand Dollars ($10,000.00) per day for violations of the Code, and associated rules.

17.  In the Administrative Compliance Order questioned herein, DEQ has assessed a total penalty of $30,000.00, for five level three violations and one level two violation; the evidence sustains the level two violation, and four of the five level two [sic] violations, however as to the level three violation concerning the notification of DEQ within 24 hours of the incident there is a partially intervening Act of God, and Respondent, while lacking in its supervision and safety culture, was sufficient in its basic rules; these two elements suggest some mitigation.

¶ 7 On January 13, 2010, NVI appealed to the district court, pursuant to 27A O.S.2011 § 2–3–502(I), alleging numerous errors in the administrative decision, and challenging its legal basis. On August 4, 2010, after trial on the matter, the district court struck the part of finding 17 of the compliance order that NVI was "lacking in its safety culture," but upheld the remainder of the order. NVI now appeals that decision pursuant to 75 O.S.2011 § 323.

### STANDARD OF REVIEW

■ ¶ 8 Under the Oklahoma Administrative Procedures Act (APA), the district court and this Court apply the same review standard for agency actions. *City of Tulsa v. State ex rel. Pub. Emp. Relations Bd.*, 1998 OK 92, ¶ 12, 967 P.2d 1214, 1219. We may set aside the ALJ's decision only if we determine one or more of the grounds listed in 75 O.S.2011 § 322 is shown, and we may not disturb the decision "unless our review of the record leads us to a firm conviction that the agency is mistaken." *Carpenters Local Union No. 329 v. State ex rel. Dep't of Labor,*

2000 OK CIV APP 96, ¶ 3, 11 P.3d 1257, 1259. Neither the district court nor this Court is entitled to substitute its judgment on factual questions for that of the ALJ as to the weight of the evidence. *City of Tulsa* at ¶ 13, 967 P.2d at 1219. Rather, we will vacate a factual finding only if it is "arbitrary and capricious," i.e., "willful and unreasonable without consideration or in disregard of facts or without determining principle," or "unreasoning ... in disregard of facts and circumstances." *State ex rel. Bd. of Trustees of Teachers' Ret. Sys. v. Garrett*, 1993 OK CIV APP 29, ¶ 6, 848 P.2d 1182, 1183.

¶ 9 NVI bases its appeal on the following APA § 322 grounds:

(1) Section 322(b)—The decision was "in excess of the statutory authority or jurisdiction of the agency";

(2) Section 322(d)—The decision was "affected by other error of law";

(3) Section 322(e)—The decision was "clearly erroneous in view of the reliable, material, probative and substantial competent evidence";

(4) Section 322(f)—The decision was "arbitrary or capricious"; and

(5) Section 322(g)—"[B]ecause findings of fact, upon issues essential to the decision were not made although requested."

## ANALYSIS

¶ 10 NVI marshals its allegations of error into three groups. As the contents of these groups overlap, we will re-formulate the allegations, starting with the broadest arguments of error and proceeding to the narrowest.

¶ 11 NVI's broadest argument is that that enabling legislation and regulations in this case do not give the ODEQ the power to levy penalties against a licensee for this type of violation. In particular, NVI argues that: (a) NVI is not liable for penalties triggered by employee actions, unless the employee action was due to a lack of training or improper policy implementation by NVI; and (b) penalties levied by the ODEQ are "punitive" in nature, and not within the purpose of the statute, and the ODEQ must show "reckless disregard" as a prelude to imposing penalties.

¶ 12 NVI's second group of arguments concerns the legal basis for the calculation of the penalty. In particular, NVI argues: (a) All the alleged violations took place on a single day, and the law limits penalties to $10,000 per day, irrespective of the number of violations; (b) there was no violation of the exposure reporting policy; (c) Oklahoma's policy regarding failure to report Roberts' exposure within 24 hours is inconsistent with that of Louisiana; and (d) a failure to report generates only a one-time penalty, i.e., it does not accrue each day the exposure is not reported.

¶ 13 NVI's third group of arguments concerns the ODEQ's findings of fact and discretionary decisions. NVI argues: (a) The penalties are arbitrary because they are inconsistent with those that Louisiana or Texas would levy in similar circumstances; (b) any reporting violation was the result of an Act of God; (c) the penalties are arbitrary because the ODEQ sought the maximum penalty in each case; (d) the ODEQ ignored evidence favorable to NVI, or failed to reduce penalties based on NVI's previous good record in the industry; (e) the ODEQ failed to make mandatory findings as to the mitigating factors that could have reduced NVI's penalty; and (f) the finding that the failures of the supervisor, Stringfellow, "represent a lack of training or preparation" is arbitrary.

¶ 14 We note that neither party provides any citation to case law, either from Oklahoma or other jurisdictions, that is directly on point to these specific issues. These issues appear to be of first impression in Oklahoma.

## I. THE PENALTY REGIME OF TITLE 27A

¶ 15 NVI's most general argument is that a nuclear materials licensee is only required to establish policies and procedures that meet the requirements of O.A.C. 252:410 and Title 27A. It argues that a proscribed occurrence caused by an employee's failure to follow these procedures results in either no administrative liability, or places liability solely on the employee.

### A. Licensee Responsibility—Who Is the Licensee?

¶ 16 NVI argues that the "licensee" who is given various responsibilities by O.A.C. 252:410 and/or 10 C.F.R. is the individual on-site "licensed radiographer," i.e., Stringfellow, not the corporate or operator holder of the license, here NVI.[5] However, 10 C.F.R. § 34.13 is clear that the licensee is the entity conducting industrial radiography and employing the certified radiographers, not the radiographers themselves.[6] We find that the licensee for the purposes of O.A.C. 252:410 and/or 10 C.F.R. is NVI, not the individual radiographer on-site.

### B. May the ODEQ "Impute Liability" to a Licensee?

¶ 17 NVI next cites to a series of older Oklahoma decisions regarding the liability of liquor licensees for the principle that due process requires that a penalty for regulatory violations may not be imputed to a licensee when the employee has actually broken the rules. We find these decisions inapplicable to the regulatory framework established by Title 27A and the associated regulations for the reasons set forth below.

¶ 18 Oklahoma's regulations in this matter are derived almost entirely from the equivalent federal regulations. Sections of 10 C.F.R. are clear that responsibility for many of the violations by a radiographer or radiographer's assistant lies, as a matter of law, with the licensee. Title 10 C.F.R. § 34.47(a) provides that "[t]he licensee may not permit any individual to act as a radiographer or a radiographer's assistant unless, at all times during radiographic operations, each individual wears, on the trunk of the body, a direct reading dosimeter, an operating alarm ra-

temeter, and a personnel dosimeter. . . ." The 24–hour reporting requirements of 10 C.F.R. § 20.2202(b) clearly fall on the licensee, not the individual employee. It is the licensee, here NVI, who is responsible pursuant to 10 C.F.R. § 34.101 to report to the Nuclear Regulatory Commission (NRC) any incident involving inability to retract the source assembly of radiographic equipment to its fully shielded position and secure it in this position.

¶ 19 We also note that 27A O.S.2011 § 2–3–502(K), requires the ODEQ to consider NVI's purported good history of violations, lack of culpability, and good faith efforts to comply in determining a penalty. If, as NVI argues, the licensee's duty is merely to establish approved policies and procedures as part of the licensing procedure, § 2–3–502(K) would not require these factors to be considered in the first instance. We find it clear in this case that the enabling statute and regulatory scheme contemplate penalties against the licensee NVI for acts proscribed by O.A.C. 252:410.

### C. "Punitive" Penalties and Reckless Disregard

¶ 20 NVI finally argues that the penalties assessed in this case are a form of punitive damages subject to the punitive damages statute, 23 O.S.2011 § 9.1. NVI argues that 27A O.S.2011 § 2–3–504 provides for an agency to assess punitive damages, and the administrative penalties in this case are punitive damages because the statute and regulations are intended to "protect the public" or encourage corrective action, rather than punish NVI. Therefore, NVI concludes, the ODEQ must prove the element of "reckless

---

5. We find no mention of "licensed radiographers" in the relevant sections of 10 C.F.R. Rather, the regulations refer to "certified" radiographers at 10 C.F.R. § 34.43 (2012).

6. Title 10 C.F.R. § 34.13 (2012), "Specific license for industrial radiography," clearly shows that the "licensee" is not the individual radiographer, as it requires the licensee to:
— Submit "an adequate program for training radiographers and radiographers' assistants that meets the requirements of § 34.43."
— Submit "procedures for verifying and documenting the certification status of radiographers

and for ensuring that the certification of individuals acting as radiographers remains valid."
— Submit "written operating and emergency procedures as described in § 34.45."
— Submit "a description of a program for inspections of the job performance of each radiographer and radiographers' assistant at intervals not to exceed 6 months as described in § 34.43(e)."
— Submit "a description of the applicant's overall organizational structure as it applies to the radiation safety responsibilities in industrial radiography, including specified delegation of authority and responsibility."

disregard" required by § 9.1 in order to assess penalties.

¶ 21 We do not agree that § 2–3–504 allows an agency to assess punitive damages as an administrative penalty. Instead, § 2–3–504 allows an agency, in a case of nonpayment or refusal to comply, to seek injunctive relief, and "recovery [*in the courts*] of any administrative or civil penalty assessed pursuant to this Code." 27A O.S.2011 § 2–3–504(F)(1). It does not mention or authorize a penalty by the agency. Section 2–3–504 states that the courts may consider additional punitive damages in that context. The statute does not provide for an agency to assess punitive damages as part of an administrative order. We find NVI's interpretation without merit, and find that the ODEQ is authorized by statute and regulation to assess penalties against NVI in this matter without a showing of reckless disregard.

## II. THE CALCULATION OF THE PENALTY

¶ 22 NVI's next arguments revolve around the provisions of 27A O.S.2011 §§ 2–3–504 and 2–3–502.

¶ 23 Section 2–3–504 (emphasis added) provides that:

A. Except as otherwise specifically provided by law, any person who violates any of the provisions of, or who fails to perform any duty imposed by, the Oklahoma Environmental Quality Code or who violates any order, permit or license issued by the Department of Environmental Quality or rule promulgated by the Environmental Quality Board pursuant to this Code:

. . .

3. May be assessed an administrative penalty pursuant to Section 2–3–502 of this title not to exceed Ten Thousand Dollars ($10,000.00) *per day of noncompliance;* or [may be subject to injunctive relief].

¶ 24 Section 2–3–502(K)(1) (emphasis added) provides that:

Unless specified otherwise in this Code, any penalty assessed or proposed in an order shall not exceed Ten Thousand Dollars ($10,000.00) *per day of noncompliance.*

¶ 25 NVI argues that a licensee may not be assessed a penalty of over $10,000 *per day* of noncompliance. ODEQ argues that we should interpret § 2–3–504 and 2–3–502, as providing for a penalty of "$10,000 *per violation per day.*" We find no case law addressing this question. However, in circumstances where the Legislature wishes penalties to be accrued on a "per violation per day" basis, it specifically states so. *See e.g.,* 21 O.S.2011 § 842.3(F) (administrative fine not to exceed $5,000 *per violation per day* for breach of tattooing regulations); 52 O.S.2011 § 318.22 (seismic exploration without permit subject to $1,000 penalty *per violation per day*); O.A.C. 165:30–3–104 ($500 penalty for breach of motor vehicle regulations *per violation per day*). To interpret the phrase "per day" as also meaning "per violation, per day" renders part of the language of these statutes superfluous, and undoes the legislatively created distinction.

¶ 26 Therefore, we find that § 2–3–504 caps total daily penalties at $10,000, and NVI may be assessed a maximum penalty of $10,000 per day of noncompliance. The only violation that may have occurred or continued after September 2, 2008, is the failure to notify the ODEQ within 24 hours of Roberts' suspected exposure, pursuant to O.A.C. 252:410–20–1(c)(13)(B), which was partially mitigated by the weather Act of God.

### A. Was There a Violation of the Reporting Requirement?

#### 1. Loss of control

¶ 27 NVI initially argues that there was no violation of O.A.C. 252:410–20–1(c)(13)(B). Subsection (c)(13)(B) references 10 C.F.R. § 20.2202, which, in turn delineates two different reporting standards, dependent upon the suspected exposure. The applicable standard states:

(b) **Twenty-four hour notification.** Each licensee shall, within 24 hours of discovery of the event, report any event involving loss of control of licensed material possessed by the licensee that may have caused, or threatens to cause, any of the following conditions:

(1) An individual to receive, in a period of 24 hours—

(i) A total effective dose equivalent exceeding 5 rems ...

¶ 28 NVI argues that, because the nuclear pellet in question was not "lost," i.e., not out of the possession of its employees, there was no "loss of control," and § 20.2202(b) does not apply.[7] However it does not disagree that for a period of time the operator did not know the true location of the pellet. Neither party cites, nor do we find, case law from state or federal courts interpreting the phrase "loss of control of licensed material" as used in § 20.2202(b). However, O.A.C. 252:410–1–4 separately regulates "lost or stolen" sources of radiation (citing 10 C.F.R. § 20.2201) and exposure that results from a loss of control (citing 10 C.F.R. § 20.2202), indicating that a "loss of control" of material differs from material being "lost ... or stolen."

¶ 29 Further, we find that NVI's interpretation places a strained and illogical construction on the regulation.[8] An exposure is equally serious whether the operator does or does not know *where the radiation source or in this case pellet is at the time of exposure.* We interpret "loss of control" to encompass situations in which an equipment malfunction or improper practice results in an unplanned or uncontrolled exposure.

### 2. When Should Reporting Occur?

¶ 30 NVI next argues that, pursuant to Louisiana practice, it is not required to report any § 20.2202(b) exposure incident until the exposure has been confirmed by a dosimeter badge analysis.[9] NVI's Radiation Safety Officer, Paul Fraley, stated that exposures are "usually" confirmed by dosimeter analysis within 24 hours. However, confirming exposures before reporting is not a requirement of the regulation. The regulation requires a licensee to report a *possible or*

*potential* exposure in addition to any confirmed exposure.

¶ 31 NVI was required to report, within 24 hours, any loss of control that *"may have caused,* or *threatens to cause"* exposure above the set limit. § 20.2202(b) (emphasis added). The regulation required the reporting of Roberts' possible exposure above limits, not simply a confirmed exposure. A delay due to dosimeter testing does not waive the requirement to report within 24 hours, absent other intervening factors.

### 3. Is the Failure to Report an Ongoing Violation?

¶ 32 Title 27A O.S.2011 § 2–3–502(K)(2) generally provides for continuing penalties if a violation persists for more than 24 hours: "For purposes of this section, each day, or part of a day, upon which such violation occurs shall constitute a separate violation." However, NVI argues that failure to follow the 24–hour notification requirement of § 20.2202(b) is a non-repeating violation, i.e., once a licensee has failed to report within 24 hours, there is no penalty for any further delay.

¶ 33 Neither party cites, nor do we find, case law from any state or federal court interpreting this 24–hour exposure reporting requirement. However, as NVI interprets the statute, once a licensee has missed a 24–hour reporting deadline, it has no incentive to report at all. Indeed, if reporting after 24 hours may incur a $10,000 penalty, while not reporting at all incurs, as most, the same cost, NVI's interpretation creates an incentive not to report at all if the 24–hour deadline is missed. We do not find this interpretation credible or reflective of the legislative or agency intent. We hold that a failure to

7. NVI cites the testimony of its Radiation Safety Officer, Paul Fraley, for this principle. However, Fraley's testimony was more nuanced than NVI's brief indicates. Fraley testified that he personally did not consider the incident to involve a loss of control, but that the way the regulation was written, any incident in which "the source does not come back into the camera, it is considered a loss of control."

8. By example, NVI's construction leads to the conclusion that, if the pellet had somehow fallen

from the exposure device and lodged in Roberts' ATV, it would be "lost or out of control," and his exposure would have been reportable, but the same exposure is not reportable because Roberts knew *where the pellet was.*

9. However NVI ignores that while Oklahoma grants reciprocal license recognition, compliance still requires that within Oklahoma the regulations and laws of Oklahoma are supreme.

report pursuant to O.A.C. 252:410-20-1(c)(13)(B) and 10 C.F.R. § 20.2202(b) is a violation that accrues after each 24 hour period in which a required report is not made.[10]

## III. ARBITRARY AND CAPRICIOUS DECISION

¶ 34 NVI's third group of arguments addresses the discretionary elements of the penalty. A decision is "arbitrary and capricious" if the administrative action is "willful and unreasonable without consideration or in disregard of facts or without determining principle," or "unreasoning . . . in disregard of facts and circumstances." *State ex rel. Bd. of Trustees of Teachers' Ret. Sys. v. Garrett,* 1993 OK CIV APP 29, ¶ 6, 848 P.2d 1182, 1183.

### A. Comity and Reciprocity with Other States

¶ 35 NVI argues that the penalties assessed by Oklahoma in this matter are arbitrary because they are higher than those assessed by other states. Particularly, NVI argues that "penalties for overexposure incidents in Louisiana and Texas are settled in the range of three to seven thousand dollars." However, NVI provides no citation to any Louisiana or Texas statute, regulation, administrative decision, or case law to demonstrate this claim.[11] Nor does it justify its assumption that the state of Louisiana acts as a model throughout the United States for "correct" penalty levels regarding nuclear exposure. We find no competent evidence that Oklahoma's penalty regime is substantially

different from other states, or any legal principle that renders an Oklahoma penalty arbitrary and capricious simply because Louisiana may have acted differently.

### B. The Reporting Violation and the Hurricane.

■ ¶ 36 NVI argues that the sole cause of its failure to report within 24 hours was the onset of Hurricane Gustav. The hurricane purportedly delayed either the testing of Roberts' dosimeter, or the subsequent reporting of results. NVI argues that it is capricious to punish it for a failure caused by an Act of God. However, the initial trigger of the failure to report was not the oncoming hurricane, but NVI's reliance on "Louisiana practice" rather than the Oklahoma administrative rules.[12] As we have discussed, the language Oklahoma adopted from 10 C.F.R. § 20.2202(b) is clear that, although NVI is free to seek confirmation before reporting, § 20.2202(b) is violated if confirmation delays a report by more than 24 hours.

¶ 37 However, NVI's initial failure to correctly follow the regulation was later compounded by the arrival of Hurricane Gustav. The testimony of NVI officer Paul Fraley was that NVI "usually" received testing results within 24 hours of a suspected reportable exposure. There was no testimony or other evidence that testing ever took 48 hours or more. Consequently, NVI's misapprehension of the regulatory requirements would not normally have delayed reporting by more than 48 hours. If NVI was unlucky in its choice to wait for confirmation before

10. Further, even if failure to report is assumed to be a non-ongoing violation, we reject NVI's argument that there was only one day of non-compliance. Failure to report does not become a violation until 24 hours after the exposure. Therefore, the first penalty accrues on the day *after* the exposure.

11. NVI's claims as to the practices of other states are based entirely on the testimony at hearing of its own Radiation Safety Officer, Paul Fraley. Even assuming Mr. Fraley would qualify as a legal expert in the administrative law of other states on this matter, we have no access to any source document he relied upon to determine the validity of his conclusions. *See e.g., Panama Processes, S.A. v. Cities Service Co.,* 1990 OK 66, ¶ 48, 796 P.2d 276, 295 ("[a]bsent an opportunity to review the source materials relied upon by the

legal experts, we are unable to divine a contrary conclusion from that reached by the trial court.")

12. In fact, Louisiana's reporting regulation contains, at 33 LAC Pt XV, § 486, the same essential language as the Oklahoma regulation: "Each licensee or registrant shall, within 24 hours of discovery of the event, report to the Office of Environmental Compliance by telephone at (225) 765-0160 in accordance with LAC 33:I.3923 each event involving loss of control of a licensed or registered source of radiation possessed by the licensee or registrant that **may have caused,** or **threatens to cause,** any of the following conditions" (emphasis added). Therefore, if Louisiana does not, in fact, require reporting before confirmation by a dosimeter test, it ignores its own requirement for the reporting of both potential, and confirmed exposure.

reporting, and did not receive results within 24 hours, the first penalty would accrue. The second and any subsequent penalties would not, however, accrue, absent the intervention of Hurricane Gustav.

¶ 38 We find that assessing a penalty for any further delay was arbitrary, as the delay was primarily caused by an Act of God, not by NVI's flawed regulatory interpretation. Therefore, NVI was in violation of regulations for two days total, and liable for a maximum total penalty of $20,000.

### C. Maximum Penalties and the Application of Mitigating Factors

¶ 39 NVI argues that the ODEQ's application of the maximum penalty in several cases was arbitrary, and that the ODEQ failed to take mitigating factors into account in calculating penalties. Therefore, our first task is to determine the penalties the ODEQ regulations allow or require.

### 1. ODEQ's Violation Levels and Penalties

¶ 40 The record contains a copy of the 2006 ODEQ "Radiation Management Penalty Guidance" (the Guidelines). The ODEQ's penalty calculation is initially based on an assessment of the severity level of a violation, from Level I to Level IV, with Level I being the most serious.

¶ 41 The document states that a Level I violation will always result in the imposition of the *maximum allowed penalty* (Guidelines page 2). A Level II violation will result in "an *administrative order with penalties*" (Guidelines page 4). A Level III violation will "typically *result in an administrative order with penalties*" (Guidelines page 6).

### a. The Gravity–Based and Economic Benefit Components

¶ 42 After assigning a violation level, the amount of the penalty is assessed based on an "economic benefit component," and a "gravity-based component" (Guidelines page 12). However, as a Level I penalty is always the maximum allowed, we must assume that no "economic benefit component" or "gravity-based component" is used in the calculation of a Level I penalty. Page 13 of the Guidelines contains a "gravity-based penalty matrix" (Matrix) stating that Level I and Level

II violations are always punished with the same mandatory maximum penalty of $10,000. If this is so, the "economic benefit component," and the "gravity-based component" are not used in calculating Level II penalties, either. The treatment of Level III is clearer, in that the Matrix states a penalty of $10,000–$5,000. As this penalty is variable, the "economic benefit component," and the "gravity-based component" can presumably be applied.

### b. The Special Circumstances Adjustment

¶ 43 The Guidelines are further confused by the "special circumstances" section of page 14, which states that the gravity-based component of a penalty may also be adjusted up or down by 25 percent based on compliance history, good faith, and degree of culpability. However, if the penalty for Level I and II is fixed at the maximum by the Matrix, if, or how, this adjustment is to be applied at those levels is unknown. The Guidelines are clearly subject to more than one reasonable interpretation, and we must fix an interpretation before addressing the penalties in this case.

### 2. Interpreting the ODEQ Penalty Matrix

¶ 44 The ambiguity of the Guidelines raises two questions: (1) which penalties are initially calculated using the economic benefit and gravity-based components, and (2) which penalties may be adjusted according to the "special circumstances" criteria?

¶ 45 Page 2 of the Guidelines is clear that a Level I violation results in an administrative order "with maximum penalties." The administrative order is the final result of all penalty calculations and adjustments. Therefore we hold that a Level I penalty is always assessed at $10,000, and is not adjusted according to the "special circumstances" criteria.

¶ 46 Page 4 of the Guidelines states that a Level II violation results in an administrative order with penalties. The Matrix indicates that this penalty is always calculated as the maximum $10,000. However, the Guidelines differentiate between Level I and Level II, in that a Level II violation does not automatically draw an administrative order "with

maximum penalties." To reconcile the maximum penalty language of the Matrix with Pages 2 and 4 of the Guidelines, we hold that Level II penalties are initially assessed as a fixed $10,000, but may be adjusted according to the "special circumstances" criteria.

¶ 47 Level III penalties are not fixed, but are calculated in a range between $5,000 and $10,000 based on the economic benefit and gravity-based components. They may then be adjusted according to the "special circumstances" criteria. We will apply this interpretation to the penalties levied against NVI.

### 3. First–Day Penalties

¶ 48 On the first day of violation (Day One), NVI was properly assessed a Level II violation (exposure to greater than 5 rem) and four Level III violations (failure to supervise, impermissible repair, inoperative alarm ratemeter, and failure to use survey meter). Assessing these violations at the *minimum possible penalty allowed* would result in a Day One penalty of $30,000. Applying the maximum 25 percent adjustment reduces this penalty to $22,500. NVI is limited by statute to paying $10,000 per day of violation. Consequently, the discretionary actions of the ODEQ had no effect on the final penalty. The Day One penalty of $10,000 does not show arbitrary or capricious action

### 4. Second–Day Penalty

¶ 49 A single Level III violation (failure to report) accrued on the second day (Day Two). A Level III violation draws a penalty of between $5,000 and $10,000. ODEQ assessed the penalty at $10,000, and did not discount it based on the special circumstances criteria. NVI argues that the initial assessment of $10,000 was arbitrary, and the ODEQ ignored NVI's compliance, good faith, and degree of culpability. The initial assessment was within the range provided, and we find nothing in the record indicating that it was "willful and unreasonable without consideration or in disregard of facts or without determining principle," or "unreasoning ... in disregard of facts and circumstances."

*State ex rel. Bd. of Teachers' Ret. Sys.* at ¶ 6, 848 P.2d at 1183.

¶ 50 Assessing the "special circumstances" criteria as to culpability, there is no evidence that NVI acted in bad faith. Further, no evidence of its prior reporting compliance, or whether it had changed its reporting policy, is cited. However, the failure to report within 24 hours was due solely to NVI's decision to apply the "Louisiana practice" of waiting for test results. We do not find the ODEQ acted arbitrarily in leaving the penalty as it stood.[13]

### D. Mandatory Findings as to the Mitigating Factors

¶ 51 NVI also argues that the ODEQ was required to make findings in its order regarding the various mitigating circumstances, and NVI's purported good history in the industry. We find no statutory or regulatory requirement for such findings. Although 75 O.S.2011 § 322(g) allows appeal when "findings of fact, upon issues essential to the decision were not made although requested," NVI cites no record that it requested such findings, or the findings it seeks were "essential."

### E. The Finding That the Incident Demonstrated "a Lack of Training or Preparation"

¶ 52 NVI finally appeals Finding 12 that Stringfellow's actions represented "a lack of training or preparation" on NVI's part. The district court previously struck the part of Finding 17 that NVI was "lacking in its safety culture,"[14] but did not directly address NVI's complaint regarding Finding 12.

¶ 53 The fact pattern in the record allows for two possibilities: either Stringfellow's actions were due to a lack of training or preparation, or he was adequately trained and prepared, but failed to apply his training. The ALJ found the former. We may not substitute our judgment on factual questions for that of the ALJ as to the weight of the evidence. *City of Tulsa* at ¶ 12, 967 P.2d at

---

13. NVI's argument appears to assume that only a downward adjustment of the penalty is possible, and hence leaving a penalty at its maximum indicates arbitrary action. However, the Guidelines provide that a penalty may be adjusted *up* *or down* by 25 percent. The ODEQ did not simply decline to adjust down, as argued by NVI, but also declined to adjust upwards.

14. The ODEQ did not appeal this decision.

1219. Therefore, if there is any evidence supporting the ALJ's decision, we must affirm it. However, in this case, we find no evidence indicating that Stringfellow was unaware of the requirements of the regulations, or that he was improperly trained. Consequently, we strike Finding 12 as an abuse of discretion.

## CONCLUSION

¶ 54 The ODEQ has the statutory power to impose penalties on NVI for violations of 27A O.S.2011 and O.A.C. 252:410.

¶ 55 The ODEQ does not need to show "reckless disregard" pursuant to 23 O.S.2011 § 9.1 in order to impose penalties.

¶ 56 Penalties are limited by statute to $10,000 per day, irrespective of the number of violations on a given day.

¶ 57 NVI was required to report Roberts' suspected exposure within 24 hours.

¶ 58 The violation of this reporting requirement accrues a penalty each time a report is delayed by 24 hours.

¶ 59 The failure to report after 24 hours was caused by NVI's misinterpretation of the reporting requirements. However, the failure to report after 48 hours and beyond was caused by Hurricane Gustav. Therefore, NVI should not have been penalized for failure to report on the third day.

¶ 60 The ODEQ and ALJ did not act in error of law, and the administrative order was not arbitrary or capricious, with the exception of Finding 12 that Stringfellow's actions represented a lack of training or preparation on NVI's part.

¶ 61 Because we find that any reporting violation after the second day was caused by an Act of God, NVI's total penalty should be reduced from $27,000 to $20,000, the statutory maximum for two days of violations.

¶ 62 The orders of the ODEQ and trial court are therefore modified to conform to this Opinion.

¶ 63 AFFIRMED AS MODIFIED.

GOODMAN, P.J., and RAPP, J., concur.